Chapter 154 of claimant ID. This is like the Tom Clancy novel that's got 1050 pages. You're never going to get to the end. So every docket I sit on, I got a claimant ID versus BP case, Mr. Clark. At any rate, we do what we do. So here we go. Claimant ID versus BP. I know the facts. It's not to make light of your case. It's just kind of a state of the affairs, I suppose. All right, you're up, Mr. Amey. Thank you. May it please the Court, Grant Amey for the appellate. This appeal, as you just noted, arises out of the BP oil spill and is at its core about the 14th Amendment due process rights of absent class members. The treatment of the appellate's claim before the Deepwater Horizon Economic Class Center demonstrates a failure to protect those rights. Sections 1.1 and 1.5 of Newburgh on Class Action, as well as the controlling law cited in those sections, makes clear that it is the trial court's job to make sure that the procedure selected to handle appellate's claims affords it due process. Specifically, the restatement of contradiction and misapplication of the settlement agreement. Honest, Amey. We know what the horn book is. Okay. You know, we got this process, the claims apparatus, claims administrator, the district court. I mean, they're on a team of these things, etc. By definition, the parties hammered this out as a process. So the court's going to exercise some discretion over which ones to see. So exercising discretion means some are, some aren't, etc. So within the scheme of the apparatus that we're familiar with, it's there, etc., you got to convince us of how, in this instance, the discretion is abused, i.e. that the district court didn't look at them. We do, and I wasn't trying to be flip in talking about the numbers, but we get a lot of these appeals where the inherent in the setup that the parties agreed to, they're going to be ones to which the court looks at, same judge, and does not. So how do you get within the zone of, this is one where the discretion is abused? After the agreement was noticed and settled, they changed it some 500 and some odd times by issuing certain things they refer to as policies. Some of these are not controversial. Others cause really big problems. Our firm alone represents 21 appellants in the Fifth Circuit litigation process who have a claim that was affected by a policy issued sometime after it was noticed and settled, and the opt-out period ran in most of those instances. Specifically here, in 2008, the claimant had a non-12-month period for its own books, a 13-month period. The exhibit 4A of the settlement agreement requires him to restate those on a month-to-month basis with contemporaneous documents. He did that. The compensation analysis yields him a positive result on those profit and loss statements. Later on, a policy called 218 was issued that says the claims administrator can, but not necessarily has to, restate them himself. That gets our guy out of compensation at all. It destroys causation. That is a contradiction. The misapplication prong of this is that he got it wrong when he restated the profit and loss statements. He restated all years, not just 2018. And if you look at tab 5 of the record excerpts, when you use the profit and loss statements originally submitted over a five-year period, they are within, I think, like 20 cents of the tax returns. If you use the claims administrator, $118,000 worth of difference. There are nonsensical adjustments. This is a grocery store. What was the basis for the adjustments? Why did the claims administrator restate it? We have no idea. When this wound its way through the in-class appellate process, the appeals panel has the right to ask the claims administrator why he did this. And he wrote over, I'm allowed to under policy 218. And that was really the end of it. There was no in-depth analysis. It wasn't like an opinion from this court that may get issued at some point that just a simple blanket, I did it because of 218. And we think that that. What got moved? Revenue across multiple line items of, we think, every single month in the 60-month period with no rational basis. You take beer and wine sales at the grocery store. Some months they go up, some months they go down. It's a nonsensical adjustment that we can't make heads or sense of, and it wasn't explained in any depth at all from the claims administrator. And when you look at the controlling law, like Hansberry v. Lee, a 1940 Supreme Court case, if you're going to adjudicate the rights of absent class members, such as this one, the procedure selected for that must ensure due process. And here... Did you raise due process below or even in your brief? It is raised both. Yes, it's in the reply brief. The Hansberry v. Lee case is cited, as well as large excerpts from Newberg's on class action. That's where I was going with this eventually. And, in fact, what we asked the judge to do in our three-page letter brief on discretionary review was to, one, take a look at all this and help us understand what he did. And, two, if he couldn't do that, let us get out of the agreement. Establish a back-end opt-out right so that we can go somewhere else that affords us due process. And after we asked him to do that, he said no in this instance, but he has subsequently said yes in other instances for other types of cases. So we know... Opt-out? Yes, sir. Unhappy with their awards? Well, there is a category of cases that is on hold for review of potential losses stemming from the moratoria on offshore drilling after the spill. And the moratoria cases were allowed either to stay in or opt-out. I know at least one of them did because we represent them. And I got a notice last night saying, we got your opt-out. You're out. File a lawsuit. So at the core of it, we're asking this court to ask the trial court to exercise its discretion over this matter individually. But those things have sort of become perfunctory. Sometimes the court says, we hear you, Fifth Circuit. We will exercise our discretion. The result stands. So as an alternative form of relief, we think that you can reverse and render with instructions to let claimants who feel as though their due process rights haven't been taken care of here to get out and pursue these things in traditional litigation. We would point out that we also think these things are told by American pipe and that there is a stipulation on the record entered into by class counsel and BP that if you file a claim with sufficient documentation, you meet the procedural requirements of OPA 90 to present your claim to the responsible party. So we think there is a legitimate way to get these things into a venue that would allow resolution of the claims in a way that protects its due process rights. And it's a traditional lawsuit in a back-end opt-out right. And to the extent there might be an argument that this is just about claimant ID 100 whatever, again, I go back to this. In the last 10 days, this firm has noticed 19 separate appeals to this court where a separate policy was enacted two weeks after its claim was filed that changed the definitions in the settlement program. So this is a reoccurring thing with a solution that we think that you can provide us. But the overall policy 218 wasn't subject to a class counsel appeal, right? I mean, I sat on the recent appeal of the other policy where class counsel as a whole challenged the new. Not to our knowledge. It's not like 495 where it's found. I don't, I can't speak for why class counsel didn't do that. I do know that we didn't find out that we had a problem with 218 in this specific instance until it was done. And our only remedy was to ask the court for discretionary review. So I think we've preserved and pursued every single challenge we possibly could have here. I can't speak for class counsel on, I don't know if there's 510 policies, but if we call it that, we know they've challenged one. So why they didn't on the other 509 instances, I just don't have an answer for the court on that. I have time, but if there's no other questions, I can save it for rebuttal. All right. Well, you framed it for us. I have a notion Mr. Clark's going to disagree, so you probably can use your rebuttal time. Understood. Very focused. All right, Mr. Clark. Thank you, your honors, and may it please the court. I'm Jeff Clark from Kirkland Ellis here on behalf of BP. I want to go through and march through all of the arguments that Mr. Amy's presented, but let me just start with the ones that he presented from the podium today and try to rebut those quickly. So he started with a due process argument saying that somehow this policy was adopted after things had happened. The terminology completely destroys that argument because policy 218, which is the only thing we're really here talking about, they really only preserve two issues, the policy 218 versus 464 ostensible conflict, and then an argument that somehow because the settlement is claimant friendly, that principle was violated here. I don't think either argument holds water, but those are the only two they presented. So first, as Judge Costa was noting, I think they've waived any due process argument. But beyond that, turning to the chronology, policy 218 was adopted in August of 2012. August of 2012 is before the opt-out period had run. It's before final approval had been given to the settlement. It's a very clear, incredibly concise mathematical formula that a competent high school student essentially could comply. I'll return to explaining why that's true, but that's the nature of the policy, and that's why no one objected to it. Mr. Kuykendall's firm that Mr. Amy is with, he notes they have dozens of cases and they have lots of other plaintiffs that they represent. They didn't raise any challenges to policy 218, and if they thought policy 218, which again is very straightforward, was somehow unlawful, they could have opted out of the settlement because the deadline didn't run, I think, until November of 2012. So the policy that they're relying on actually, policy 464, was adopted in 2013, in September of 2013. I think that chronology totally turns on its head, Mr. Amy's argument, because there was nothing in the settlement that specifically said what happens if you keep your books on a quarterly basis. What there is in Exhibit 4A is a clear instruction to the claims administrator that he has discretion whenever any data is put before him to penetrate into the validity of that data, to ask questions about it, to re-crunch the numbers. He has a bunch of expert accounting vendors, and he uses them, and they ask the questions here. They applied policy 218. They converted quarterly financials into monthly financials. That's all they did. They didn't move revenues around in some kind of willy-nilly way. All they did was take policy 218 and say, you know, if you have a period that is, say, 28 days long or something like that, that period will be January, and then we'll figure out what portion is going to be the rest of January, because January has 31 days. That's how policy 218 works. So I think the due process argument falls. The second reason why I think this case falls that came up when Mr. Amy was at the podium is the question from Chief Judge Stewart about the fact that there's a threshold requirement, as the Bailey-Lumber panel had held, that you have to show that Judge Barbier, by not taking a particular case, abused his discretion. And this is a, you know, I'll explain more about it when I kind of march through each of the issues, but it's very fact-bound. And it only involves a swing of about $179,000 worth of revenue in 2009. And if Judge Barbier is taking a look at that, and he's taking a look at this argument that there's a supposed conflict between policies 218 and 464, when I'd submit to you manifestly there is no such conflict, he was clearly within his rights to just not, you know, invest his time on this case. And I don't think that either the opening brief or the reply brief really tried to make any attempt at explaining why Judge Barbier should have invested time in this case to reach the obvious conclusion that we think, you know, would mean that the CSSP should be affirmed. So then, at the podium, I count, you know, Mr. Amy is raising three other issues that are not in the brief. So in that sense, it's very much like the modus operandi that was used at the CSSP level. There were just a grab bag of arguments that were thrown up. Then, you know, the funnel narrowed. And then, you know, you get to a point where virtually all of those arguments have been waived by the time of the opening brief. So there are three things he mentioned that I just want to try to give some context around, even though I think they're clearly waived. One is he started talking about moratoria cases. I mean, first of all, that's irrelevant. We're not talking about a moratoria situation here. But just to tell the court what's going on with that, there's a section of the moratoria claims. The parties have to agree on a set of parameters about how to resolve those. So it turns out, years after the settlement was entered into, the parties still haven't reached a resolution on how to deal with those claims. Class counsel tried, as to those claims, to have Judge Barbier sort of force a resolution as to how to resolve them substantively on the parties. But Judge Barbier resisted that. And then, not surprisingly, you know, he denied that motion from class counsel. Again, that's totally irrelevant to anything in this case. But in terms of the opt-out issue that Mr. Amy's raising in connection with that, what happened there is that Judge Barbier, seeing the impasse between the parties for so many years, essentially said, you know, look, the expectation at the time was there'd be some kind of agreement. The agreement's not forthcoming. Your options are either to continue to wait for that to occur, claim it, or if you, you know, think that you don't want to wait for that anymore, then you can opt out, and they'll give you a deadline to opt out. But again, that whole set of issues is just completely irrelevant to this dispute about Policy 218 versus 464. Then Mr. Amy started talking about American pipe tolling. But since they have no ability to get out of the settlement at this point, and they could have opted out when they saw Policy 218, if they thought it was objectionable or unlawful in some form. And they didn't. I think American pipe tolling is completely irrelevant as well, and also even if it was not, it would have been waived. And the third thing Mr. Amy referred to was OPA presentment, the requirement that before you can file an OPA case in federal court, you have to first have presented the claim to one of the responsible parties and asked them to pay it. And then there's a waiting period of 90 days, and, you know, the whole object of that scheme is to try to resolve claims out of court so that, you know, there's never even a need for a class action settlement like this. Again, just totally irrelevant, not an issue that was raised below, and is thus waived. So I think it's another red herring. So now if I could, let me kind of just circle back to an affirmative presentation with the remainder of my time, if I was moved, what revenues were moved and why? No revenues were moved, Your Honor. The only thing that occurred was converting quarterly revenues into monthly revenues. That's what I understood, but he said they on their own, Food Giant, restated it into monthlies, but then you came up with different monthly figures. So that's correct, and you can see what methodology the, I shouldn't say we, BP didn't restate it. Administrator. The CSSP did the restatement. You can see what methodology to restate that the CSSP used, and that methodology has never been challenged as an incorrect methodology, that it was applied incorrectly. It's a highly mathematical, you know, very simple formula. It's about a paragraph long in Policy 218. How they reallocated the revenues or tried to convert the revenues on their own, they clearly did it, but all you have is their output. They never explain what the output is. They never explain why the method that they used is superior. I think that's arguably a waiver in and of itself, but certainly if you're going to try to say that, you know, we get under Policy 464, the claimant would be the we there, to, you know, put in what we think the conversion should be, and then the claims administrator under Policy 218 can do the same thing. If you're going to make an objection about how that's improper, you have to explain how it is that it's improper, and I think the whole point of Policy 218 is it's an incredibly mechanical and transparent process, right? There's no mystery in it. It's not like some accountant sitting somewhere, and he's like, hey, I'm going to move the meat revenues or the ice cream revenues. It just takes, you know, a period chunk of revenues, and then looks at how many days are in January and how many days are in February, and then just kind of, you know, straight lines them out. That's all that happens, and still, I don't see anywhere really in the record or in the briefing where it's ever explained how the expert accountants, you know, the professionally prepared P&Ls that were restated on a monthly basis by the P&Ls. If you haven't, you know, put that in the record, you really haven't even gotten to square one on trying to make some kind of argument that Policy 218 is improper. One of the big things they make a big deal out of in the reply brief is Record on Appeal 1640, so I'd urge you to take a look at that. At Record on Appeal 1139, that's where claimant says that the key had causation. You know, that was 2009, because you can use different periods, right? You can use 2009, 2008, and 2009 average, and 2007 to 2009 average, etc. They say use 2009, so if you look at 1640, Record on Appeal 1640, in the 2009 column, you see that they say that their revenues are $48 million, right? As they calculated, $48.068717, versus the claims administrator coming to $247,752. If you do the math on that, it's a $179,000 swing. So, you know, that swing is what ultimately led the causation test here to be flunked, and circling back to Chief Judge Stewart's point about the importance of the standard of review. I mean, requiring Judge Barbier to look at all those kinds of calculations and then decide whether he thinks that, you know, he's going to second guess what the accountants did at the claims facility, that just, he'd have to take all of the cases, and I think the Court's repeatedly said that's not, you know, the way this discretionary review process is supposed to go. Then we talked about the waiver of most of the arguments, including the due process argument. Policy 495 came up briefly, but Policy 495 isn't relevant here. They had made some noise about it below, but it's not what is an issue in this appeal. And under this appeal, right, the AVM methodology, and I know Judge Costa, you were on that panel, would apply, and that's about moving expenses. And these guys lost, not because of any kind of movement of expenses, they lost because of the conversion of quarterly revenue data into monthly revenue data, because it's only the revenue pattern that's relevant for determining whether you meet the V-test or not. It's not the variable process test, I'm sorry, variable profits test. There's no matching of revenues and expenses, which is what Policy 495 is all about. It's just entirely irrelevant to this case, and we think that's why they dropped that argument. What they should have done, and this was the purpose of the last argument we made in our red brief, is if they couldn't meet the V-test once the quarterly data was properly restated into monthly form, then they should have argued that because they, you know, they had a decline pattern that they could meet the requirements of the decline-only revenue test. And there's a recent case that came out just last week about that test where a claimant lost, because there's extra factors one needs to show to meet the decline-only revenue pattern causation test. And these folks here from Food Giant didn't even make any attempt to try to meet that test, and we think that's an additional reason why their claim fails. So, I think, let me just try to do this in terms, the only thing that the claimant's really arguing, other than some smoke that they toss up in these new issues that were either never raised below or just they'd raised at one point and then were waived by the time we got to the opening brief, is an argument that Policy 218 and 464 conflict with each other. That's really the issue that they briefed. And I think it's just really self-evident if you read those two policies that they're not in conflict with each other. First of all, Policy 218 was adopted first. And it deals highly specifically only with the issue of what happens if you have a claimant, since all the settlement formulas drive off of monthly data, who in the regular course of their business kept their profit and loss statements on a quarterly basis. And it says, we're basically just going to use a mathematical conversion based on the number of calendar days in a month to do that conversion. It's incredibly straightforward. No one objected to it again. No one opted out, as far as we know, based on that. Then, more than a year later, Policy 464 was adopted. And Policy 464 is a more general policy, and it doesn't deal with this specific issue of converting quarterly to monthly data. Policy 464 is about a number of things. It's about whether claimants can restate their financials. If they used cash, can they restate them on an accrual basis? The answer is yes in that policy. Or if they use accrual basis accounting in the ordinary course of business, can they restate them into cash basis? The answer is no. It deals with that issue. And primarily, in terms of how it overlaps with this case, it deals with the issue of what happens if you don't have profit and loss data in the ordinary course. We're probably talking, as the policy recognizes, about a pretty small business. So a small business just decides, what the heck, I kind of know whether I'm making money. I'm not going to keep profit and loss statements. So, obviously, there are businesses like that. And the intention of the settlement was not to just preclude them entirely and throw them out and say, hey, if you don't have data that you kept in the ordinary course, you're not going to be eligible. So what happens in that case is there are provisions made for folks to kind of just provide whatever financial data they do have to the claims administrator. And then the claims administrator's accountants will take it from there, and they'll try to reconstruct monthly profit and loss statements so that they can apply the formula in the settlement. And I'd submit to you that, yes, there's an indication in there that if a claimant has the ability to try to do some of that work for the claims administrator's accountants themselves, it says they may submit profit and loss statements on a monthly basis if they didn't have them initially. Sure, they may do it. But there's nothing in there that carries Mr. Amy's argument that says that if a claimant opts to do that, that the claims administrator has no choice but to basically kind of shut his brain off and say, oh, the claimant's given me profit and loss statements on a monthly basis now. Now I'm just going to use those numbers. I'm not going to test those numbers. I'm not going to inquire about any more data. I'm just going to mechanically take whatever the claimant tells me at face value. And, obviously, claimants have a self-serving interest in trying to do those restatements in ways that don't necessarily comport with accuracy or comport with the tests. And so, not surprisingly, in Policy 464, there are several reservations of rights to the claims administrator to question data, to call for more data, to make use of the brainpower and the expertise his accountants have to figure out what the right real economic and accounting answers are. And, in any event, you know, maybe I should have actually started with this point, neither Policy 218 nor Policy 464 are binding. In terms of what was agreed to in the settlement agreement, it's Exhibit 4A. And Exhibit 4A makes clear in several places on pages 1 and 2 that the claims administrator has discretion to decide whether to ask for more information. So, on page 1, it says the claimant, I'm sorry, that all statements made in and documents submitted with the claim form may be verified as judged necessary by the claims administrator. And on page 2 of Exhibit 4A, the claims administrator may, in his discretion, request source documents for profit and loss statements. And so, if you have quarterly financials, which is really what you kept only in the ordinary course, and you ask for, you know, those statements so that you can process the monthly analysis that drives a settlement agreement, it's obvious that the claims administrator has the power to ask for that. It's within his granted discretion under what the parties agreed to in Exhibit 4A of the settlement. So, if there are no further questions, I'll rest there. Thank you, Mr. Clark. Back to you, Ms. Damey. Mr. O'Donnell. Thank you. With respect to their argument that they did not do the accounting wrong, there is one year at issue here. It's 2008. They kept their books on a 13th month basis. He said it came down to $179,000 worth of revenue in 2009. They can't do anything in 2009 under Policy 218 because it had 12-month reporting basis, and 218 doesn't apply to that year. It only applies to 2008. So, there's a demonstrable error, and that's what we asked the judge to review, and he didn't do it. With respect to the chronology, he's absolutely right. On the day we filed the claim in May of 2013, Exhibit 4A mandates we make monthly profit and loss statements. 218 is enacted. It says the settlement program may do it in certain instances, and the settlement agreement has multiple places that say it's a claimant-friendly thing, that the settlement agreement will only maximize compensation, that it will treat everything in the most claimant-friendly right. So, we sat down the street when it was at the Fairness Hearing, and those points were touted over and over and over again. There was no reason for us to think that they would use something inconsequential, as it seemed at the time, like 218 to totally redo our numbers and do them wrong on the back end of it anyway. So, he also says something about this decline-only pattern, and it's a red herring. If they would have done the math right, we wouldn't have been a decline-only pattern. We would have met the V-test, so we didn't have to submit all of this. And just so you know what he's asking about submitting, we would have, at some point, had to have listed the names and addresses and amounts of sales of every transaction in a grocery store. So, if somebody walked in and bought a pack of gum with a dollar bill, we would have no way of knowing where this person ever lived. And so, it's an impossible test to meet. It's called the customer mixed data test, and it's part of the decline-only causation standard. So, it's a red herring to bring that up anyway, and even if we could provide the evidence, it's a virtually impossible thing to do. So, I mean, I think they really did get the accounting work wrong here. Well, if you have quarterly reporting, as I understand it, they convert it to monthly by just saying, well, there's three months, and we're going to portion it according to how many days in those months, basically a portion on a day-by-day basis. What's unreasonable about that? Because we had monthly profit and loss statements and quarterly profit and loss statements for every year. We submitted those. 2008 had a 13-month basis instead of a 12-month basis. Don't ask me why the CFO did it that way. They seized upon that small fact to apply 2018 to all five years, and that's the error. If you're going to do it, at least do it to 2018, and then the annual totals would work, because it's just like you said, a pro-rata basis. But if you look at the chart in Record Excerpt 5, it's Exhibit B, about one of our briefs below. It's the last page of the Record Excerpts on the fifth tab. There is a chart year by year by year. It is off $118,000 on the restated profit and loss statements over five years. I don't remember the exact number, but it's something like 12 cents over five years on ours. So when he says we didn't mount a record below about the factual inconsistencies about why our accounting was better than theirs, it's in there. And it's in a chart form provided by the CFO of the claimant on a year-by-year basis. And, you know, we argued that in the briefs. I appreciate y'all's time. Thank you so much. Thank you. Whatever your argument. All right. Thank you, both counsel. This completes the argument for our panel.